Good morning, Your Honors. Eric Slepian on behalf of Michael Kelly. I'm going to attempt to reserve two and a half minutes for rebuttal. In this social security matter, we ask that the decision of the administrative law judge be remanded as it is not free of legal error. The ALJ rejected treating physician opinion and other evidence of disability for reasons that are not supported by substantial evidence. For example, she rejected evidence writing that Kelly's MRI did not reveal significant central canal stenosis and then concluded that pain complaints lacked believability. But the ALJ didn't adequately cite us to that MRI, and the decision doesn't reflect what it actually states. Specifically, this MRI says that Mr. Kelly suffers desiccated disc at L3-4, L4-5, and L5-1. So we normally defer to the ALJ's interpretation of raw test results. Obviously, we're not doctors. And so to the extent the ALJ makes an interpretation, we would defer. I mean, the ALJ notes that there were normal and abnormal findings, but says they're not sufficient to show a disabling impairment, no lumbar fracture or stenosis. And so was there evidence in the record from a doctor that said the MRIs did show lumbar fracture or stenosis? No, but Kelly never claimed disability based on lumbar fracture. The ALJ's determination that there was no lumbar fracture or stenosis is not disputed. It's not disputed and it's irrelevant to the issues that are before you, Your Honor. Let me ask you this. Is it proper for the ALJ to make that kind of interpretation of a raw MRI? So she can repeat what the MRI states, but she's not able to interpret the significance of those findings. The issue that we have here, and specifically to address your concern, Judge Akuta, she referenced the part of the MRI, but she does not reference those other parts, those abnormalities, the abnormalities that treatment's based on and that the pain complaints are caused by. So the ALJ relies on a number of different issues. One is that the objective medical imaging didn't indicate a disabling impairment. And so I wasn't sure that there was anything that stated that the MRI images did indicate a disabling impairment. I didn't see anything to that effect in the record. I mean, there's other, there's statements by Ratcliffe, which then he moderates later on and says the pain is out of proportion to what the objective medical evidence shows. But the ALJ also looks at a number of other things as well. So let's talk about those objective findings, because that's what the administrative law judge missed. And to my reply brief, I put in a diagram that actually shows where Mr. Kelly's problem is and what the judge focused on. So there's a difference between central stenosis and lateral stenosis. What Mr. Kelly has is lateral stenosis. But we're not, as judges, we're not going to be able to evaluate medical data. That's not our role. We're just looking at whether the ALJ made a legal error or not. Correct. And it's not the ALJ's ability. Well, we've said in Decker that it is the ALJ's job to make those determinations. Not to interpret medical evidence. It's her job to review this medical evidence and ascertain whether the objective findings could reasonably cause the reported symptoms, which she says they do. Now, she questions the degree, because there's no fracture. But you don't need a fracture to have radiculopathy, positive baggards, mass effect on a nerve root, because this isn't in and you don't need central canal stenosis for those symptoms either. Had the ALJ said, look, I recognize that this individual has lateral stenosis. He's got mass effect on a nerve root. But I find that his symptoms don't correlate to this because. And then cited the evidence. And where is there a doctor making the statements that you're making to us right now? What? The radiology report is the doctor that says that it's disabling impairment. I mean, in other words, it describes what was seen in the MRI, but it doesn't make the conclusion as to Mr. Kelly. Well, an MRI is not going to say this impairment is disabling or this impairment is not disabling. And the law recognizes that MRIs don't do that. And where is the doctor giving an interpretation of the MRI and says, these images in the MRI show me that he has disabling pain? I mean, Dr. Ratcliffe said in his later report that the reported pain from Mr. Kelly  And then Dr. Ratcliffe went on to assess functional capacity based on the objective data that he reviewed, not based upon the claimant's complaints. And he specifically states that in his report, that these assessed limitations are consistent with the objective data. And take a look at the treatment notes. Not only those objective findings, but what did they do for him? He failed injections. He failed the TENS unit. They're working him up for a pain pump. I mean, they increased his morphine to, I forget what the numbers were, but like three times. So Dr. Ratcliffe suggests that the pain. So he goes to a pain clinic, and one pain clinic discharges him because he's using, he's not following their direction and they find drugs in his urine that he took outside of the clinic and was not taking the drugs that they had prescribed. So that's why they discharged him. And then Dr. Ratcliffe took him on and then reaches the same conclusion that the pain is out of proportion to the objective evidence. Okay. So Dr. Page in his evaluation noted that Mr. Kelly's pain was so severe that he was running out of his pain medications early. Because in the record show, he was taking his pain medications every four hours. They didn't give him more. He didn't abuse the medications. And then it also showed that he used medical marijuana. It was a medical marijuana. And so when he got discharged and he started treatment with Dr. Ratcliffe, he was continuously tested for marijuana after that. And he stopped using it because the doctors told him to. And if you look at the consultative examiner's report, at that time he was using two to three times a month. Now, you have an individual with a mass effect on a nerve root with radiculopathy, which is pain that travels down his leg. And none of these things are working for him. Was there a diagnosis of that? I may have missed that. Of what? Radiculopathy. Yes, almost throughout the entire record. And who made that? Dr. Ratcliffe continually made that diagnosis. Did you want to save some time for rebuttal? Yes, Your Honor. Okay. Thank you. Let's hear from the court. Good morning. May it please the Court, my name is Martha Bowden, and I'm appearing today on behalf of the Acting Commissioner of Social Security. First, I want to respond to a couple of things that counsel talked to you about. It is true that Dr. Ratcliffe treated Mr. Kelly for a couple of years leading up to the ALJ's decision. And what he found was, after giving him more and more narcotics, he made a decision right just before that hearing, and you referred to it, I think, Judge Acuda, that he felt that the pain complaints that Mr. Kelly was reporting were out of proportion to the objective findings, including, and he named the MRI report and a CT scan. He felt that that didn't explain his pain, the back issue. And what he thought was probably causing it, he wanted to change strategies. And what he wanted to do was send Mr. Kelly for a psych examination, because he thought maybe the mental health issues played a role in the level of pain that he was having. And he told him that, I will discharge you from this clinic, one, because you have had inconsistent drug screens, and he repeatedly warned him about that. He also said, I'm referring you for psych counseling and you must go, or I will discharge you from this clinic, because I think, and the other thing he wanted to do was taper down the pain medications. At that time, at the time the hearing came around, Mr. Kelly was on the equivalent of about 900 milligrams of morphine per day, which was double what Dr. Ratcliffe thought was appropriate. And so he really recommended a detoxification program, and that was in the plan right as the hearing happened, and we don't have any updated records since then. So, yes, Mr. Kelly was discharged from the first pain clinic, and it wasn't just that he ran out of his medications early. It was that he was testing positive for things that he wasn't supposed to be taking, and he was testing negative for things he'd been prescribed for whatever reason. And so that's where he got to Dr. Ratcliffe. Let's see. Also, the whole idea that the ALJ interpreted the medical evidence in form of the MRI as if she were a doctor really is not persuasive. In fact, she said the same thing that Dr. Ratcliffe said. So she pretty much accepted Dr. Ratcliffe's assessment that the MRI did not explain the back pain that this gentleman was reporting. That was his medical opinion, and that's pretty much what the ALJ said as well. I'm not an expert in the difference between foramenal narrowing and stenosis. I don't have an M.D., but I think what the ALJ did was she fulfilled her role to review the evidence, to consider everything she had in front of her, and to decide how to interpret it and how to ---- What about her reasons for discounting Kelly's credibility? Were those legitimate or were they flawed? They were ---- She gave several clear and convincing reasons for discounting Mr. Kelly's credibility. She agreed with the reviewing doctors that she was unable to give him full credibility because he ---- the medical records did not support the extent of the limitations that he reported. Didn't she place a lot of almost excessive weight on that, on those records? She looked at a lot of things. She looked at the objective evidence in the form of the MRI and also some of the physical examinations, like the one of Dr. Briggs. He was the consultative examiner who evaluated Mr. Kelly in April of 2012. He and Mr. Kelly told him, my pain has ---- the medication is effectively treating my pain. And then Dr. Briggs looked at the records and he noted only that having reviewed them all, ostensibly the MRI as well, the only thing that stood out to him was that there was an assessment of opioid dependency. He did an examination, and that examination was ---- he found that there was a reducible hernia. Otherwise, there were no objective findings of any orthopedic issues at all. There was no loss of range of motion, no tenderness to palpation of Mr. Kelly's back. These are some things you see. What about rejecting Kelly's wife's statements? What about that? Well, Mr. Kelly's wife, Sherry Kelly, pretty much said the same things that he said, that he was in so much back pain that he was lying down a lot and he was really not able to do any activities of daily living. Isn't that a legitimate thing for a spouse to talk about? Well, the ALJ decided it wasn't. She discounted that testimony. Why? She said that it was not supported by the evidence and also that she was not a medical doctor. But can she testify to what she observes? That's what she did. She can. She can and she did. And because her testimony was substantially similar to Mr. Kelly's, even if the ALJ's reasons were not germane to Mrs. Kelly, that would be harmless error under the Molina analysis, which I'm sure you're familiar with. So it wouldn't have changed the outcome if the ALJ erred and did not give a germane reason or more than one germane reason or any germane reason to discount Mrs. Kelly's testimony. It would have been harmless error. Could you sum up for me why the ALJ discredited Dr. Ratcliffe's opinions? Yes. She found it inconsistent with the objective evidence, including that MRI, which basically adopted his impression of that MRI. Now, there were two MRIs, right? There was a 2011 and a 2012. 2012. Yeah. And I don't think there was a comparison made and I don't think there was significant change. That's my recollection. She also found that there were multiple physical examinations showed no neurological signs. She also discounted Dr. Ratcliffe's opinion. Was that the basis for Dr. Ratcliffe's opinion? That there were no neurologic signs? Right. He didn't say. You mean for Ratcliffe's opinion that the medical, that the MRI did not? No, his overall, his objective, his objective findings. He doesn't say on, it's a checkbox and it says, is this supported by objective findings? Well, is there anything in the record that shows that he relied upon the neurological? No. Right. No, there's no, he doesn't discuss that. He does, he does diagnose radiculopathy, but he doesn't, he doesn't note on exams neurologic signs. Why would the, why would it be proper for the ALJ to rely on that as a basis for discrediting Dr. Ratcliffe's opinion? Oh, well, she, she said this was in the context of having his opinion not be supported by the evidence. And so she was chronicling the evidence she thought was inconsistent with someone who was in such bad pain from low back pain that they couldn't work. There should have been some signs of a neurological impairment? That would have made his opinion more persuasive. She also talked about how Mr. Kelly reported on numerous occasions that his back pain improved with medication. And so she thought that undermined Dr. Ratcliffe's opinion, that he was totally unable to sustain full-time work. And she also, she also noted that she agreed with the reviewing doctors who found that there were no significant functional limitations and the medical records did not support what his, what his testimony was. Those were all the things she evaluated when she was looking at Dr. Ratcliffe's opinion. If Dr. Ratcliffe's opinion is credited, is he entitled to benefits? No. Why not? Because one of the things that Dr. Ratcliffe found was that there was evidence of substance abuse. There was things like amphetamines and THC in his system that they told him, they didn't prescribe for him and they told him not to be using that. And so now we have a case where even if it turns, even if you decide that he is disabled and that the ALJ erred and you credit evidence as true that's consistent with disability, the case has to go back again because we now have to make a finding about whether drugs were material to that disability. Step 6 or whatever it is. Yes, step 5.2, part 2. Right. Right. Okay. Did you? Okay. Anything else? Any more questions? No. Okay. Okay. Thank you, counsel. Thank you. We appreciate your argument. Thank you. So counsel indicates that the administrative law judge relied on the opinion of the consultative examiner in rejecting reported symptoms. But I do want to point out the consultative examiner found that there were no severe limitations, no medical impairments that met a severity description under the regulations. And when the administrative law judge looked at that, at page 23 she writes, it's inconsistent with the record. I'm unable to assign Dr. Briggs' opinion any significant weight. The administrative law judge rejected it. And then what's really peculiar in this case is there was an opinion from a non-treating, non-examining physician who said exactly the same thing as Dr. Briggs. He said there was no severe impairment. There were no medical limitations at all. So the administrative law judge says, and Dr. Briggs, well, that's inconsistent with the MRI pain complaints treatment. I can't give it any weight. And then she turns around and gives the other opinion significant weight. You cannot reconcile those two findings. And then if we look at the case law, it tells us that the opinion of the treating physician is generally entitled to the greatest weight. Then a consulting, examining physician, which she rejected. And then lastly, the non-treating, non-examining physician opinions, which for reasons you cannot figure out from this record, she gives significant weight, too. And so when we look at this record, and look what Mr. Kelly did, okay? He was making $40,000 to $70,000 a year. He was in pain. He was having these surgeries for his bladder, his hernias, his abdominal wall. And so he decided he was going to try to start a staffing business on his own where he could control his hours. He can control his duties. And that didn't work. And so then we submitted to the administrative law judge the bills that have been piling up. He's got medical bills that he's unable to meet. He's got taxes that he's unable to meet. And he goes on to lose his house. This is not an individual who just sat back and said, I'm going to collect a disability benefit. This is an individual who, despite all of those financial hardships that are documented in this record, continued to try to treat his unrelenting pain. Do you want to address the drug issue? Yes. So the drugs is marijuana. And he had a medical marijuana card. So there were no other drugs? Because opposing counsel was mentioning amphetamines and other drugs. It was prescription drugs and medical marijuana. And that's all that this record shows.  Okay. Thank you. Thank you, counsel. We appreciate your arguments on this matter. And it's submitted at this time. Thank you.
judges: Paez, Ikuta, Adelman